UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**KENDALL JOHNSON**                                                                CIVIL ACTION

**VERSUS**                                                                                 NO. 16-3718

**W.S. McCAIN, WARDEN**                                                      SECTION: "A"(3)

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Kendall Johnson, is a state prisoner incarcerated at the Rayburn Correctional Center in Angie, Louisiana. On October 14, 2009, he was convicted of possession with intent to distribute cocaine under Louisiana law.[1] On January 29, 2010, he pleaded guilty to being a fourth offender and was sentenced as such to a term of forty years imprisonment without benefit of probation or suspension of sentence.[2] On October 12, 2010, the Louisiana Fifth Circuit Court of

---

[1] State Rec., Vol. 1 of 7, transcript of October 14, 2009, p. 182; State Rec., Vol. 1 of 7, minute entry dated October 14, 2009; State Rec., Vol. 1 of 7, jury verdict form.
[2] State Rec., Vol. 2 of 7, transcript of January 29, 2010; State Rec., Vol. 1 of 7, minute entry dated January 29, 2010; State Rec., Vol. 1 of 7, guilty plea form.

Appeal affirmed his conviction and sentence.[3] The Louisiana Supreme Court then denied his related writ application on April 1, 2011.[4]

On February 14, 2013, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on February 13, 2014.[6] His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on May 12, 2014,[7] and by the Louisiana Supreme Court on April 2, 2015.[8]

On February 11, 2016, petitioner filed a "Motion to Correct Illegal Sentence" with the state district court.[9] That motion was denied on February 26, 2016,[10] and the Louisiana Fifth Circuit Court of Appeal then denied his related writ application on May 17, 2016.[11] Petitioner sought review of that denial by the Louisiana Supreme Court,[12] and his writ application currently remains pending before that court.

---

[3] State v. Johnson, 52 So.3d 110 (La. App. 5th Cir. 2010); State Rec., Vol. 2 of 7.
[4] State v. Johnson, 60 So.3d 1248 (La. 2011); State Rec., Vol. 3 of 7.
[5] State Rec., Vol. 4 of 7. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to the *pro se* filings in this case, this Court will simply use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the filing date placed on the document by the clerk of court. Any slight imprecision resulting from this method is ultimately of no consequence because petitioner's application is untimely by several years.
[6] State Rec., Vol. 4 of 7, Order dated February 13, 2014.
[7] State v. Johnson, No. 14-KH-205 (La. App. 5th Cir. May 12, 2014); State Rec., Vol. 4 of 7.
[8] State ex rel. Johnson v. State, 162 So.3d 395 (La. 2015); State Rec., Vol. 4 of 7.
[9] State Rec., Vol. 4 of 7.
[10] State Rec., Vol. 4 of 7, Order dated February 26, 2016.
[11] State v. Johnson, No. 16-KH-180 (La. App. 5th Cir. May 17, 2016); State Rec., Vol. 4 of 7.
[12] State Rec., Vol. 7 of 7, writ application in Case No. 2016-KH-1168.

In the interim, petitioner filed the instant federal application seeking habeas corpus relief on or about April 22, 2016.[13]  The state has filed a response arguing that the application is untimely.[14]  The state is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[15]  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, the Louisiana Supreme Court denied petitioner's direct-review writ application on April 1, 2011.  As a result, his state criminal judgment became final for AEDPA purposes, and his federal limitations period therefore commenced, ninety days later on June 30, 2011.  His limitations period then expired one year later on July 2, 2012,[16] unless that deadline was extended through tolling.

---

[13] Rec. Doc. 4.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  That date is not apparent from petitioner's filing; however, the application was mailed to this Court in an envelope metered on April 22, 2016.  Rec. Doc. 4-11, p. 3.

[14] Rec. Doc. 13.

[15] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

[16] The Court is aware that, because 2012 was a leap year, the three-hundred-sixty-fifth day of petitioner's one-year period was June 29, 2012.  However, courts have held that it is the "anniversary date" on which the AEDPA's statute of limitations expires, regardless of the existence of an additional day due to a leap year.  See, e.g., United States v.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). However, petitioner had no such applications pending before the state courts during the applicable one-year period.[17] Therefore, he clearly is not entitled to statutory tolling.

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence

---

Hurst, 322 F.3d 1256, 1261-62 (10th Cir. 2003); United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000); Zeno v. Louisiana, Civ. Action No. 06-4096, 2009 WL 3190461, at *3 n.17 (E.D. La. Sept. 30, 2009). Moreover, because the "anniversary date" of June 30, 2012, fell on a Saturday, the federal limitations period here was extended through the following Monday, July 2, 2012. See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed.R.Civ.P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

[17] Although petitioner later sought post-conviction relief in the state courts, it is clear that applications filed after the expiration of the federal statute of limitations have no bearing on the timeliness of a federal application. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put, once the federal limitations period has expired, "[t]here [i]s nothing to toll." Butler, 533 F.3d at 318.

demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court also notes that the United States Supreme Court has held: "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).  Here, petitioner does not invoke McQuiggin.  However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that petitioner has not made the showing required under McQuiggin for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned: "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted).  With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's conviction is based.  That evidence is recounted in the Louisiana Fifth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> At trial, Detective Chris Morris testified, that, at that point, he had worked for the Jefferson Parish Sheriff's Office ("JPSO") for six years, with four of those years in the narcotics division. Detective Morris further stated that, on October 8, 2007, he received information from a registered confidential information that a heavy-set African-American man, wearing a light-colored shirt and a black hat, was selling crack cocaine at the corner of Pasadena Avenue and Airline Drive in Jefferson Parish. The confidential informant, who had witnessed such transactions, did not give Detective Morris the subject's name. Detective Morris knew that neighborhood was a high crime area where numerous narcotics and prostitution arrests had been made.
> Based on that information, Detective Morris, who was in plain clothes and an unmarked car, initiated surveillance of the corner. Detective Morris spotted a man, who fit the description given by the informant, standing on the corner of Pasadena and Airline Drive.
> As Detective Morris looked on, a man approached the subject under surveillance, stopped very close to the subject for less than 30 seconds, then walked away. Detective Morris testified that, after the first man left the area, a second man approached defendant. Again, the man approached the subject under surveillance, stopped very close to the subject very briefly, then walked away.
> After the second unknown male left the scene, a third man, who was riding a bicycle, approached the subject under surveillance. As the third man neared, the subject turned and moved toward a dark area of a parking lot. At that point, Detective Morris activated his police lights and entered the parking lot where the surveillance subject and the cyclist were extant. Officer Kurt Zeigler and Lieutenant Danny Jewell, who were in position nearby, moved in to assist Detective Morris.
> Immediately, the cyclist, who had not yet made contact with the subject, attempted to ride away, but Detective Morris stopped him. Because the cyclist had not reached the subject and was not in possession of any contraband, Detective Morris allowed him to leave the scene.
> Thereafter, Detective Morris informed the surveillance subject that he was investigating reports of illegal activity. He advised the subject of his rights under <u>Miranda v. Arizona</u>,[FN1] and the subject, who is defendant herein, indicated he understood those rights.
>
> [FN1] 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

6

Detective Morris testified that, at that point, defendant appeared very agitated. Defendant was sweating profusely and clenching his thighs together, which led the officer to believe that the subject might be carrying a weapon.

When Detective Morris asked defendant if he had "anything on him," defendant replied that he did not. Defendant invited Morris to pat him down and check his pockets. While Detective Morris was performing a pat-down search of defendant's clothing, he noticed a large bulge in defendant's pants below the belt buckle. Detective Morris testified that, when he asked defendant what the bulge was, defendant admitted that it was crack cocaine.

Detective Morris immediately unbuttoned defendant's pants and unzipped the zipper a bit. He discovered two clear plastic, sandwich-type bags, which contained individually-wrapped, off-white rocks.[FN2] One sandwich bag held ten individual rocks, and the other held seven rocks. Defendant was also in possession of $31.00 in cash.

> [FN2] Each rock was wrapped in a small piece of plastic wrap. Each package was tightly closed with a small knot.

Subsequent testing revealed that the gross weight of the first bag was 1.64 grams and the gross weight of the second bag was one gram. Further, when eight rocks were randomly selected from the two bags and tested, each sample tested positive for cocaine.[FN3]

> [FN3] Charles Krone, a criminalist for the Jefferson Parish Crime Lab, conducted the testing. His results were included in a report that was introduced at trial.

Immediately after arresting defendant, Detective Morris learned that defendant lived at 565 Central Avenue, which was not far from the crime scene. After Detective Morris observed the complicated manner in which the contraband was packaged, he believed that the defendant had to package the rocks in a secure environment, not on the street.

As a result of his observation, Detective Morris questioned the defendant, who admitted that he had crack cocaine at his apartment. The police officers then took defendant back to his apartment, where both defendant and his live-in girlfriend gave their written consent to the police to search the residence. Thereafter, defendant led the officers to a bedroom, where they found an expensive pair of men's shorts with $300.00 in cash in one pocket and a large plastic-wrapped, off-white rock in the other. Subsequent testing revealed that the large rock weighed 4.53 grams and tested positive for cocaine.

At trial, Lieutenant Daniel Jewell was accepted as an expert in the area of the value, sale, packaging, and distribution of street-level, controlled dangerous substances. Jewell testified that he has been employed with the JPSO for eight years, seven and one-half of which he has spent in the narcotics division. Prior to

>   that, he had other police experience, including four years with the New Orleans Police Department where he regularly made narcotics arrests.
>   Lieutenant Jewell testified that the rocks seized from defendant at the scene appeared to weigh about .1 gram each, and would, to his knowledge, sell for about $10.00 on the street. He noted that each rock was wrapped individually in plastic. In Lieutenant Jewell's opinion, the manner of packaging indicated an intent to sell the rocks individually, rather than to consume them personally. Further, the large rock seized from defendant's apartment, which would be worth approximately $500.00 on the street, is also an amount indicative of resale.
>   Lieutenant Jewell stated that, based on his experience with crack abusers, the average addict does not carry a substantial amount of crack with him at one time. While a user might buy crack in bulk to save money, the typical user can only afford to buy one or two rocks of crack at a time. Even heavy users will buy a small quantity for immediate use, then find more money, then buy more drugs.[18]

The foregoing "old" evidence was obviously compelling evidence of guilt, and so petitioner would face a daunting burden to present a credible "actual innocence" claim. Specifically, the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added). Here, petitioner presents no new evidence whatsoever, much less any evidence of the type or caliber referenced in Schlup. Therefore, he has not met "the threshold requirement" for McQuiggin to apply, i.e. a showing that "in light of the *new* evidence, *no juror*, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup, 513 U.S. at 329; emphasis added). Accordingly, McQuiggin does not aid him.

---

[18] State v. Johnson, 52 So.3d 110, 115-17 (La. App. 5th Cir. 2010); State Rec., Vol. 2 of 7.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than July 2, 2012, in order to be timely. His application was not filed until on or about April 22, 2016, and, therefore, it is untimely.

**RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Kendall Johnson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[19]

New Orleans, Louisiana, this thirteenth day of October, 2016.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[19] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.